IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**THOMAS K. HOGGE,**

    Plaintiff,

v.                                        Civil Action No. 3:09CV582

**HARVARD STEPHENS,** *et al.*,

    Defendants.

## MEMORANDUM OPINION

Plaintiff, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this action under 42 U.S.C. § 1983. Plaintiff alleges that the ten named Defendants[1] failed to timely diagnose his hepatitis C, failed to properly treat his condition, and failed to properly treat a tumor in his lung. Defendants Amonette, Harris, Hoffman, Manckavasag, Badgett, and Johnson have filed motions to dismiss.[2] This matter is ripe for judgment.

### I. MOTION TO DISMISS STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

---

[1] Defendants are: Linda Robb, former phlebotomist at Powhatan Medical Unit; Mark Amonette, M.D., former Chief Institutional Physician at Powhatan Correctional Center; Alvin Harris, M.D., former Chief Institutional Physician for Deerfield Correctional Center ("DCC"); Charles Hoffman, M.D., Institutional Physician at DCC; S. Manickavasag, Institutional Physician at DCC; Keith Davis, Warden of DCC; Bonita Badgett, RN, Medical Administrator at DCC; Fred Schillings, Director of Prison Health Services; Harvard Stephens, M.D., Chief Medical Authority for the Virginia Department of Corrections ("VDOC"); and Mary Johnson, RN, a nurse at DCC.

[2] Defendants Amonette, Harris, Manickavasag, Davis, Badgett, and Johnson filed a joint motion to dismiss on October 27, 2009 (hereinafter "Defs.' Mot. Dismiss"). Defendant Hoffman filed a separate motion to dismiss on February 3, 2010 (hereinafter "Hoffman's Mot. Dismiss"). By Order entered on August 20, 2010, the Court ordered Plaintiff to provide a correct address for Defendant Robb, and to show cause for failing to timely serve her.

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (*citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle only applies to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*, 550 U.S. at 555 (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (*citing Bell Atl. Corp.*, 550 U.S. at 556). Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his

or] her claim." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (*citing Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it does not act as the inmate's advocate, *sua sponte* developing statutory and constitutional claims the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

## II. PLAINTIFF'S ALLEGATIONS

Plaintiff seeks relief for various instances of alleged malfeasance dating back to March of 2000, when a routine blood test revealed that his platelet count was low.

### A. Facts Relevant to Plaintiff's Liver Condition

#### 1. Diagnosis and Medical Treatment of Plaintiff's Hepatitis and Related Conditions

Plaintiff has been incarcerated since 1997. On March 2, 2000, routine blood tests showed that Plaintiff suffered from a low platelet count. These results were reported to Defendant Robb, and a second round of tests were ordered. On March 13, 2000, Defendant Robb was informed that the second round of tests also showed an abnormally low platelet count. No further action was taken, and Plaintiff was not informed of the results of his blood tests.[3]

---

[3] Plaintiff contends that Defendant Amonette "must have been made aware of this problem, especially since he had written on [the March 2, 2000 results] 'Chart Please.'" (Compl. ¶ 3.)

3

On February 2, 2006, while Plaintiff was incarcerated at DCC, blood tests revealed abnormalities in Plaintiff's blood, including low white blood cell and platelet counts. Follow-up screening performed on February 14, 2006 revealed that Plaintiff was suffering from hepatitis. On March 9, 2006, Dr. Harris of DCC requested a liver biopsy to determine the extent of any liver damage. A doctor at the Medical College of Virginia ("MCV") denied this request due to Plaintiff's low platelet count. Dr. Harris also requested a consultation with gastro-intestinal ("GI") specialist Dr. Menasha. Dr. Harris also prescribed a multivitamin. For approximately eighteen months, Dr. Harris performed "routine" blood tests every six months. Due to Plaintiff's low platelet count, Dr. Harris refused to submit a request for hepatitis treatment in response to Plaintiff's own requests, explaining that such a request "would only be denied." (Compl. ¶ 8.)

In August or September of 2007, Dr. Harris was replaced by a team of three doctors: Dr. Kazlauskas, Dr. Manickavasag and Dr. Ajumobi. On September 25, 2007, Plaintiff's medical team performed a blood test (Fibrosure) as a substitute for a liver biopsy. On October 3, 2007, Dr. Kazlauskas submitted an anti-HCV drug treatment request to Defendants Stephens and Schilling. Stephens and Schilling denied the request due to Plaintiff's low platelet count.

Plaintiff then met with Dr. Manickavasag, who recommended an abdominal CT scan to determine the condition of plaintiff's liver, spleen, and other organs. On April 17, 2008, Dr. Manickavasag performed an abdominal CT scan. Based on the results, he recommended a consultation with a hepatologist[4] and GI specialist. On August 13, 2008, Plaintiff saw a GI specialist at MCV, who recommended an upper endoscopy, liver ultrasound, and further blood

---

[4] The CT scan revealed a small mass in Plaintiff's lung. Facts relevant to the treatment of this mass are discussed in the following subsection of this opinion.

4

tests in order to accurately diagnose Plaintiff's condition. On October 27, 2007, Defendants Stephens and Schilling denied the ultrasound, recommending alternative testing such as Fibrosure. Dr. Manickavasag did not submit a request for upper endoscopy until December 19, 2008.

On January 26, 2009, Plaintiff saw a second GI specialist, Dr. Menasha. Dr. Menasha does not practice at MCV, and "has no connection with or ties to the V.D.O.C., as far as [Plaintiff] knows." (Compl. ¶ 29.) Dr. Menasha recommended an upper endoscopy, as well as an ultrasound of the liver, with additional ultrasounds to follow every six months.[5] (Compl. ¶ 29.) On February 18, 2009, an upper endoscopy was performed, and six bands were placed around Plaintiff's esophageal varices.[6] On March 10, 2009, five more bands were placed on esophageal varices during a second upper endoscopy procedure. On March 19, 2009, a liver ultrasound was performed. No follow up appointment was scheduled, however, and Plaintiff filed an informal complaint to arrange for one on May 10, 2009. (Compl. ¶ 47.)

On May 17, 2009, Plaintiff filed a grievance because staff had not performed the blood tests recommended by specialists. Defendants responded that recommendations need not be followed if the institutional physicians disagree. As of August 26, 2009, Plaintiff had not been taken for a follow-up consultation.

---

[5] Plaintiff also asserts that Dr. Menasha "confirmed several of the plaintiff's allegations and beliefs; more testing should have been automatically done in 2000 when low platelets count was first discovered by Robb and Amonette; Platelet count is not too low for treatment as this is a relative contra-indicator, not an absolute one." (Compl. ¶ 29.)

[6] Plaintiff contends that the delay in treatment led to the development of these varices and the concomitant risk of death should one of the bands burst.

5

### 2. Nutritional Treatment of Plaintiff's Hepatitis and Related Conditions

On March 25, 2008, medical staff placed Plaintiff on a special diet. The special diet was discontinued on July 30, 2008, for no apparent medical reason. Plaintiff asserts that the July 30, 2008 CT scan showed significant improvement to his liver. According to Plaintiff, "[t]he only difference in [his] lifestyle and living conditions between [the two scans] was being placed on a special diet [which] called for 'greens with meals'" [which] allowed plaintiff to eat fresh vegetables, and sometimes fruit . . . in place of the processed foods being served." (Compl. ¶ 23.) On September 4, 2008, Defendant Hoffman wrote in Plaintiff's chart that no medical indication for any special diet existed. Plaintiff is not currently receiving a special diet.

### 3. Materials Relevant to the Proper Standard of Care

Plaintiff has submitted materials which he claims establish the prevailing standard of care for his liver ailments. The "State HCV Treatment Guidelines - Virginia" establish criteria for treatment, all of which Plaintiff allegedly meets except for platelet count. (Compl. ¶ 31 (*citing* Compl. Addendum OO).) According to Plaintiff, these guidelines establish that low platelet counts are not an absolute contraindicator for treatment, and that patients with a platelet count under 50,000/mm can receive half dosages. Plaintiff contends that the guidelines for hepatitis C treatment issued by the Federal Bureau of Prisons similarly indicate that "Plaintiff has no absolute contraindications to either Interferon or Ribavirin . . . and the only relative contraindication is the low platelet count." (Compl. ¶ 32 (*citing* Addendum PP).) Plaintiff has also submitted information from the National Digestive Diseases Information Clearing House which he interprets to establish that: (1) Plaintiff is at a high risk of developing liver cancer if his hepatitis is not treated; (2) Plaintiff is relatively likely to respond to treatment; (3) Plaintiff's

6

condition should be evaluated quickly due to the presence of fibrosis in his liver, and, (4) that low platelet count does not categorically disqualify him from treatment for hepatitis C. (Compl. ¶ 33.) In addition, Plaintiff has submitted information by manufacturers (Compl. ¶¶ 35-36 (*citing* Addenda SS-TT)) which allegedly indicates he is a candidate for treatment.

### B. Facts Relevant to Plaintiff's Lung Condition

On July 17, 2008, Plaintiff visited a pulmonologist at MCV, who recommended a chest CT scan and a follow-up appointment. On July 30, 2008, the CT scan occurred, but no follow-up appointment occurred until July 9, 2009. (Compl. ¶ 49.) At the follow up appointment, Plaintiff was informed that "the condition is stable and nothing else needs to be done regarding this matter." (Compl. ¶ 49.) Plaintiff claims that the delay caused him stress and worry.

### C. Allegations Relevant to Other Instances of Inadequate Care

Plaintiff alleges other instances of inadequate care for which he does not seek relief, but which he contends help establish Defendants' indifference to his condition. While under Dr. Harris's care from March 2006 to Fall 2007, Plaintiff requested vaccinations for hepatitis A and B. Defendant Harris informed plaintiff that he did not need these vaccinations. After the three-doctor team replaced Defendant Harris, Plaintiff requested and received "what he was led to believe" were both vaccinations. (Compl. ¶ 12.) Plaintiff later learned that he had received only a hepatitis B vaccination. On January 26, 2009, Plaintiff requested a hepatitis A vaccination, and received it a few days later. Plaintiff explains that "[t]his is just one more example of the plaintiff not being able to rely on or depend on the defendants . . . to provide adequate and appropriate, standard and rountine [sic], medical care and treatment." (Compl. ¶ 12.)

Blood testing performed on October 6, 2008 indicates "the possible presence of a malignancy . . . which could be liver cancer, testicular cancer or related to the lump that was discovered on [P]laintiff's abdomen . . . on [April 17, 2008]." (Compl. ¶ 26.)

Plaintiff discovered that the multivitamin he had been taking lacked supplements recommended for those suffering from hepatitis C, cirrhosis, and low blood count. Dr. Manickavasag denied Plaintiff's request for a more complete vitamin, explaining that VDOC policy did not allow it. On October 27, 2008, Plaintiff's Level I grievance on this issue was deemed unfounded. (Compl. Addendum NN.) Plaintiff is apparently receiving a different vitamin now. Plaintiff explains that "[t]his is just another example of the defendants['] indifference to plaintiff's medical needs. Plaintiff must discover things on his own and then approach the medical staf[f] and fight for appropriate care and treatment." (Compl. ¶ 27.) Plaintiff similarly requested a pneumococcal vaccination on his own initiative, which he received on January 30, 2009. According to Plaintiff, "[t]his vaccination should have been automatically offered to the plaintiff once it was discovered that he has Hepatitis C." (Compl. ¶ 28.)

### III. PLAINTIFF'S CLAIMS

Plaintiff raises the following claims:

Claim 1   Plaintiff's Eighth Amendment[7] rights were violated by the level of treatment given for his hepatitis C by:

    (A)   Defendant Stephens;
    (B)   Defendant Davis;
    (C)   Defendant Schilling;
    (D)   Defendant Amonette;
    (E)   Defendant Harris;

---

[7] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

        (F)    Defendant Hoffman;
        (G)    Defendant Manickavasag;
        (H)    Defendant Badgett;
        (I)    Defendant Johnson; and,
        (J)    Defendant Robb.

Claim 2    Plaintiff's Eighth Amendment Rights were violated by the level of treatment given for a tumor in his lung by

        (A)    Defendant Stephens;
        (B)    Defendant Davis;
        (C)    Defendant Schilling;
        (D)    Defendant Manickavasag; and,
        (E)    Defendant Badgett.

Plaintiff admits that an additional claim regarding treatment for a growth in his abdominal wall "has become moot as plaintiff was seen by a general surgeon concerning this and it was recommen[d]ed that nothing be done at this time due to the cirrhosis and low platelet count." (Pl.'s Resp. Mot. Summ. J. ¶ 14A.) This claim is deemed to have been withdrawn.

## IV. THE MOTION TO DISMISS

Defendants Amonette, Harris, Hoffman, Manckavasag, Badgett, and Johnson have moved to dismiss Plaintiff's claims against them.

### A. Eighth Amendment

An inmate's Eighth Amendment rights are violated when he is subjected to an unnecessary and wanton infliction of pain, *see Wilson v. Seiter*, 501 U.S. 294, 298 (1991), "contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A two-part test is used to determine whether prison conditions present a constitutional violation. The plaintiff must show: "'(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the

part of prison officials.'" *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (*quoting Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991)). The first showing requires the court to determine whether the deprivation of a basic human need was "*objectively* 'sufficiently serious,'" while the second requires it to determine whether the officials *subjectively* acted with a "'sufficiently culpable state of mind.'" *Id.* (*quoting Wilson*, 501 U.S. at 298). Defendants do not argue that Plaintiff has failed to allege an objectively sufficiently serious medical need.

"Deliberate indifference is a very high standard-a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (*citing Estelle*, 429 U.S. at 105-06). Generally, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (*citing Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). The mere fact that some level of treatment was rendered, however, does not preclude a finding that an official acted with deliberate indifference. *See Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.") (*citing Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)); *Estelle*, 429 U.S. at 104 n.10 (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) for the proposition that a "doctor's choosing the 'easier and less efficacious treatment' of throwing away the prisoner's ear and stitching the stump may be attributable to 'deliberate indifference . . . rather than an exercise of professional judgment'") (alteration in original); *cf. Mabry v. Freeman*, No. 2:06cv12076, 2007 WL 2332392, at *7 (E.D. Mich. Aug. 15, 2007) (finding no deliberate indifference where, unlike defendants in cases relied upon by the Plaintiff, defendant did not

"thoughtlessly continue with the same treatment under circumstances where Plaintiff's condition continued to deteriorate," but instead "attempted to adapt his treatment to Plaintiff's needs"). A plaintiff may also prove deliberate indifference by introducing evidence that a defendant recklessly refused or delayed in providing a plaintiff with access to medical professionals with sufficient expertise to evaluate and treat a particular condition. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1277-79 (10th Cir. 2001) (concluding prison doctor's obviously ineffectual efforts to attach Plaintiff's severed finger could support an inference of deliberate indifference).

### B.  Claim 1(D): Defendant Amonette

Defendant Amonette moves for dismissal on the grounds that Plaintiff has not alleged that Defendant Amonette was personally involved in his medical care. (Defs.' Mem. Supp. Mot. Dismiss 8-9.) In his complaint, Plaintiff alleges that medical personnel were aware that his low platelet count indicated a serious medical need because a second blood test was ordered, yet no treatment was given, and Plaintiff was never informed of his condition. Plaintiff alleges that Defendant Amonette's awareness of these facts is evident from his notation on Plaintiff's medical chart. Plaintiff has also explained that "Amonette was the doctor in charge" and that "[a]s far as [P]laintiff knows, Amonette was the only doctor seeing inmates and the charts of inmates." (Pl.'s Resp. Defs.' Mot. Dismiss 2.) He further contends that early detection would have given him "a much better chance of successful treatment and less damage done to plaintiff's health." (Compl. ¶ 6.) Plaintiff has alleged facts sufficient to raise an inference that Defendant Amonette knew of and disregarded a preventable, serious risk to Plaintiff's health.

Defendant Amonette also alleges that Plaintiff's claim is barred by the statute of limitations.[8] Because 42 U.S.C. § 1983 does not explicitly provide its own statute of limitations, the courts borrow the personal injury statute of limitations from the relevant state. *See Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (*citing Wilson v. Garcia*, 471 U.S. 261, 266-69 (1985)). Virginia applies a two-year statute of limitations to personal injury claims. *See* Va. Code Ann. § 8.01-243(A). Federal law, however, controls the calculation of the date on which the cause of action accrues. "A claim accrues when the plaintiff becomes aware of his or her injury, *United States v. Kubrick*, 444 U.S. 111, 123 (1979), or when he or she 'is put on notice . . . to make reasonable inquiry' as to whether a claim exists." *Almond v. Sisk*, No. 3:08cv00138, 2009 WL 2424084, at *4 (E.D. Va. Aug. 6, 2009) (*quoting Nasim*, 64 F.3d at 955) (alteration in original). Defendant Amonette does not offer any authority or analysis for the proposition that Plaintiff's claim against Defendant Amonette accrued on the date Plaintiff discovered he was infected with HCV. Moreover, he admits that Plaintiff's cause of action may have accrued "as late as the 'middle' of 2007." (Mem. Supp. Defs.' Mot. Dismiss 8.) Defendants' imprecise allegations do not suffice to demonstrate that the statute of limitations had run when Plaintiff filed this complaint on September 9, 2009.[9] Although Defendant Amonette may ultimately prevail on this issue, the Court cannot dismiss Plaintiff's claim on the record before it. Defendants' Motion to Dismiss will be DENIED as to Claim 1(D).

---

[8] Because Defendant Badgett's affidavit on this matter contains no information relevant to this defense, the Court declines to consider it with respect to the motion to dismiss.

[9] Contrary to Defendant Amonette's assertion, an inmate complaint is deemed filed when it is deposited in the prison mailing system, not when the Court receives it. *Houston v. Lack*, 487 U.S. 266 (1988)

12

## C. Claims Against Defendants Harris, Manickavasag, and Hoffman

Defendant Harris moves to dismiss because "the facts alleged do not establish that the treatment provided was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." (Mem. Supp. Defs.' Mot. Dismiss 9.) Defendant Harris fails to fairly address the allegations in Plaintiff's complaint, and provides no authority or analysis supporting his position.[10] As for Defendant Harris's contention that the statute of limitations bars Plaintiff's claim, he relies on the same reasoning put forth in support of Defendant Amonette's similar argument. Defendant Harris's attempt to invoke the statute of limitations defense fails for the same reasons. Defendants' Motion to Dismiss will be DENIED as to Claim 1(E).

Defendant Manickavasag argues that Plaintiff's allegations do not demonstrate that he "had any control over [delays or denials of treatment,] or that his treatment of Plaintiff was so grossly incompetent, inadequate, or excessive as to shock the conscience." (Mem. Supp. Defs.' Mot. Dismiss 10.) Defendant Manickavasag fails to identify and apply the relevant law to any portions of Plaintiff's complaint that are deficient in this respect, or to direct the Court to those portions of the complaint. Moreover, Defendant Manickavasag is clearly alleged to be responsible for addressing Plaintiff's concerns with his lung, liver, diet, and HCV treatment. (Compl. ¶ 41.) Defendants' Motion to Dismiss will be DENIED as to Claims 1(G) and 2(D).

Defendant Hoffman argues that Plaintiff has insufficiently alleged any personal involvement on the part of Defendant Hoffman. Contrary to Defendant Hoffman's argument,

---

[10] Defendants Manickavasag, Badgett, and Johnson offer only cursory arguments in support of the motion to dismiss. Specifically, in the three paragraphs in which the defendants make their case, they offer no citations to the complaint and only one citation to legal authority.

13

Plaintiff has alleged that Defendant Hoffman played a role in denying treatment (Plaintiff's special diet) for a serious medical need. Plaintiff has alleged that this denial contributed to various subsequent ailments, including the development of esophageal varices, that clearly constitute a "serious or significant" injury. *Strickler*, 989 F.2d at 1381. Defendant Hoffman also argues entitlement to qualified immunity. If Defendant Hoffman wishes the Court to evaluate his defense of qualified immunity he must do more than mention its existence and demand dismissal of the suit. He must: (1) identify the specific right allegedly violated; (2) brief, with full pinpoint citation to authority, whether the right was so clearly established as to put a reasonable official on notice of his legal obligations; and (3) describe to the Court the factual scenario supporting the assertion that a reasonable official in Defendant's situation would have believed his conduct was lawful. *See Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990). Defendant Hoffman's Motion to Dismiss will be DENIED.

### D.  Claims Against Defendant Johnson

Plaintiff alleges that Defendant Johnson engaged in "a continued and predictable pattern of denials and delays in arranging medical care, treatment, evaluations, testing and diagnosis" (Compl. ¶ 52), including his liver ultrasound (Compl. ¶ 44). Plaintiff claims that Johnson's misfeasance "contributed to and led to the developement [sic] of esophagul [sic] varices, deterioration of white blood cells and platelet count, cirrhosis of the liver from hepatitis C and organ damage." (Compl. ¶ 52.) Defendant Johnson fails to cite to the portions of the complaint that she argues "suggest that these failures . . . were caused by a delay by [officials in] Richmond in granting approval." (Mem. Supp. Defs.' Mot. Dismiss 11.) Defendants' motion to dismiss will be DENIED as to Claim 1(I).

### E. Claims Against Defendant Badgett

Plaintiff alleges that Defendant Badgett, in her role as Head Medical Administrator at DCC, knew of and disregarded the fact that Plaintiff was receiving substandard medical care, and that she could have remedied the situation. These allegations are sufficient to state a claim. *Cf. Brown v. N.C. Dep't of Corr.*, --- F.3d ----, 2010 WL 2891166, at *3 (4th Cir. Jan. 11, 2010) (finding allegations that defendant was nearby during attack sufficient to state a claim for failure to protect). Defendant Badgett fails to direct the Court to any contrary authority for the proposition that Plaintiff has not established her liability. Defendants' motion to dismiss will be DENIED as to Claims 1(H) and 2(E).

### V. CONCLUSION

The motions to dismiss (Docket Nos. 7, 22) will be DENIED. Any further dispositive motions must be filed within sixty (60) days of the date of entry hereof.

It is so ORDERED.

/s/
Richard L. Williams
United States District Judge

Date: SEP 2 4 2010
Richmond, Virginia