# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

THOMAS K. HOGGE,

      Plaintiff,

v.                                                                                  Civil Action No. **3:09CV582**

HARVARD STEPHENS, *et al.*,

      Defendants.

## MEMORANDUM OPINION

Plaintiff, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983. Plaintiff's complaint arises out of allegations that Defendants[1] improperly diagnosed and treated Plaintiff for hepatitis C while Plaintiff was incarcerated at Deerfield Correctional Center ("DCC"). Defendants Badgett, Johnson, Amonette, and Hoffman filed a motion for summary judgment (Docket No. 52) as did Defendants Harris (Docket No. 57) and Manickavasagar (Docket No. 65). Plaintiff has responded to these motions. These matters are now ripe for disposition.

---

[1] The original Defendants were: Linda Robb, former phlebotomist at Powhatan Medical Unit; Mark Amonette, M.D., former Chief Institutional Physician at Powhatan Correctional Center; Alvin Harris, M.D., former Chief Institutional Physician for DCC; Charles Hoffman, M.D., Institutional Physician at DCC; S. Manickavasagar, Institutional Physician at DCC; Keith Davis, Warden of DCC; Bonita Badgett, RN, Medical Administrator at DCC; Fred Schilling, Director of Prison Health Services; Harvard Stephens, M.D., Chief Medical Authority for the Virginia Department of Corrections ("VDOC"); and Mary Johnson, RN, a nurse at DCC. Defendants' names are spelled various ways throughout the record. The Court employs the spelling used in each Defendant's respective affidavit supporting their motion for summary judgment.

# I. PROCEDURAL HISTORY

On September 9, 2009, Plaintiff filed a complaint against Defendants.[2] Plaintiff complains about the quality and quantity of treatment he has received for hepatitis C and a mass on his lung. By Memorandum Opinion and Order entered on September 24, 2010, the Court denied the motions to dismiss filed by Defendants Johnson, Badgett, Manickavasagar, Harris, Amonette, and Hoffman. (Docket Nos. 45, 46.) The Court granted the motion for summary judgment filed by Defendants Schilling and Davis because Plaintiff sought relief from them on a vicarious liability theory. The Court also granted Defendant Stephens's motion for summary judgment because Plaintiff failed to produce evidence indicating that Defendant Stephens was deliberately indifferent to Plaintiff's medical needs.

Plaintiff's remaining claims are as follows:

Claim 1    Plaintiff's Eighth Amendment[3] rights were violated by the level of treatment given for his hepatitis C by:

        (D)    Defendant Amonette;
        (E)    Defendant Harris;
        (F)    Defendant Hoffman;
        (G)    Defendant Manickavasagar;
              (1)    with respect to the CT scans;
              (2)    with respect to the Plaintiff's multivitamin;
              (3)    with respect to Plaintiff's soft tissue swelling;
              (4)    with respect to the hepatitis A and B vaccinations;
        (H)    Defendant Badgett;
        (I)    Defendant Johnson; and,
        (J)    Defendant Robb.

---

[2] Pursuant to *Houston v. Lack*, 487 U.S. 266 (1988), an inmate's submission is deemed filed on the date it is handed to prison staff for mailing.

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

| Claim 2 | Plaintiff's Eighth Amendment rights were violated by the level of treatment given for a mass in his lung by: |
|---------|------------------------------------------------------------|
| | (D) Defendant Manickavasagar; and, |
| | (E) Defendant Badgett. |

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* former Fed. R. Civ. P. 56(c) and 56(e) (1986)). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Nevertheless,"'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (*quoting Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 & n.7 (5th Cir. 1992)).

3

The parties have submitted numerous documents and affidavits. Of course, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Furthermore, summary judgment affidavits must "set out facts." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citation omitted) (*citing Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 975 (4th Cir. 1990); *Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1252 (4th Cir. 1991)). The absence of an "affirmative showing of personal knowledge of specific facts" prevents the consideration of such facts in conducting the summary judgment analysis.[4] *EEOC v. Clay Printing Co.*, 955 F.2d 936, 945 n.9 (4th Cir. 1992) (internal quotation marks omitted).

At this stage, the Court is tasked with assessing whether Plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). The Court notes that although Plaintiff's complaint is unsworn, Plaintiff attempts to transform his unsworn complaint (Docket No. 1), his responses to previously denied motions to dismiss (Docket Nos. 20, 30), and his responses to the various motions for summary judgment (Docket Nos. 63, 64, 71) (collectively, the "Putative Verified Pleadings") into sworn pleadings. Plaintiff

---

[4] Plaintiff's conclusory statements regarding the mental states of Defendants are therefore insufficient to establish a material issue of fact.

attempts to do so by including a verification at the beginning of each of his responses to Defendants' motions for summary judgment. The verification states:

> I, Thomas K. Hogge, . . . reallege all claims and allegations within the original filing, Plaintiff's Response to the Motion to Dismiss and the Memorandum in Support and hereby verify that the matters alleged therein are true except as to matters alleged on information and belief. and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

(Resp. Mot. Summ. J. (Docket No. 71) 1; *see also* Docket Nos. 63, 64.) Plaintiff attempts to verify his responses to motions for summary judgment by including a similar verification at the end of each document. (Docket Nos. 63, 64, 71.)

This verification is substantially similar to that analyzed in *Walker v. Tyler County Commission*, 11 F. App'x 270, 274 (4th Cir. 2001).[5] In *Walker*, the United States Court of Appeals for the Fourth Circuit did not permit such verification to transform the complaint into an affidavit because the complaint did not indicate which factual allegations were based on the plaintiffs' personal knowledge. *Id.* at 274 (explaining that former Federal Rule of Civil Procedure 56(e) required an affidavit opposing a motion for summary judgment to be based on personal knowledge). The Fourth Circuit regarded the complaint as resting on "mere pleading allegations." *Id.*

The Fourth Circuit's *Walker* decision applies with equal force to Plaintiff's verification. The Federal Rules of Civil Procedure require that "[a]n affidavit or declaration used to support or

---

[5] The verification at issue in *Walker* states: "[T]he facts contained within the attached pleading [are] true, except insofar as they are therein stated to be upon information and belief, and insofar as they are therein stated to be upon information and belief, [Plaintiff] believes them to be true." *Walker*, 11 F. App'x at 274. Nevertheless, as is the case here, "[t]he factual allegations in the complaint do not indicate which, if any, are based on personal knowledge." *Id.*

oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Plaintiff's verification does not suggest that every statement set forth in the Putative Verified Pleadings are based on Plaintiff's personal knowledge or that Plaintiff is competent to testify on the matters stated. A review of the Putative Verified Pleadings confirms, for example, that Plaintiff is attempting to swear to "standard [medical] practices and procedures" based on his own reading of inadmissible medical journals. (Compl. 7.)[6] Plaintiff's averment regarding what he believes constitutes the appropriate, accepted standard of medical care for hepatitis C is simply not admissible. *See Bell v. Kolongo*, No. 1:03cv00501, 2004 WL 3247156, at *4 (E.D. Va. Oct. 25, 2004) (granting motion to strike inmate's statements regarding the accepted standards of medical care).

Moreover, a verification "based upon '[the plaintiff's] own personal knowledge *or upon his information and belief*'" is insufficient for the purposes of opposing a motion for summary judgment because such verification avoids the possibility of perjury. *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (emphasis added); *see Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998) ("Because we cannot assess whether Causey had first hand knowledge of these facts or whether he is competent to testify to them, we cannot consider them in our review." (*citing Price*, 947 F.2d at 832; *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988))); *Reed v. Richards*, No. 93-1190, 1994 WL 259442, at *2–3 (7th Cir. June 13, 1994).

---

[6] Because Plaintiff did not number all of the pages of his complaint, the Court identifies pages as they are numbered by CM/ECF.

Accordingly, the Court construes Plaintiff's Putative Verified Pleadings as "mere pleading allegations." *Walker*, 11 F. App'x at 274; *c.f. Bowman v. Johnson*, No. 3:08cv449, 2011 WL 1167320, at *2 n.2 (E.D. Va. Mar. 24, 2011) (prohibiting a *post hoc* declaration of truth from transforming an unsworn complaint into admissible evidence). Nevertheless, to the extent that Plaintiff's responses to the motions for summary judgment direct the Court to specific statements in the Putative Verified Pleadings, as they must, Fed. R. Civ. P. 56(c)(3), the Court will undergo an independent analysis regarding the admissibility of those statements. *Evans*, 80 F.3d at 962 (upholding district court's disregard of "many portions" of an affidavit, instead of the entire affidavit, which the district court deemed improper in accordance with Federal Rule of Civil Procedure 56); *see also Walker*, 11 F. App'x at 274.

## III. ANALYSIS

### A. Claims in which Plaintiff Has Failed to Demonstrate the Defendant Was Personally Involved in Plaintiff's Medical Care

At the outset, it is appropriate to dispense with claims in which Plaintiff has failed to adduce any competent evidence demonstrating that the defendant was personally involved in Plaintiff's medical care.

#### 1. Allegations Against Dr. Amonette

On March 2, 2000 and March 13, 2000, Plaintiff received routine blood work while a prisoner in VDOC. (Compl. 6.) This blood work revealed that Plaintiff had a low platelet count. "[P]laintiff was never notified of, made aware of, consulted about or warned of these lab results." (Compl. 6.) Plaintiff submitted several lab reports that he suggests indicate that Defendant Robb was aware of the results. Plaintiff concludes that Defendant Amonette also knew of these results,

because somebody wrote "Chart Please" on one of the reports, although it is unclear who wrote that on the report. (Compl. 6.) Plaintiff asserts that Defendant Amonette showed a deliberate indifference to Plaintiff's medical needs because Amonette ignored the results of the blood work, thus placing Plaintiff in imminent danger of physical harm.

### 2. Summary Judgment Evidence Regarding Dr. Amonette

The lab reports that Plaintiff submitted indicate that Dr. Repass, not Amonette, was responsible for the report. (Compl. Addenda A1, A2.) Dr. Repass was the "reception center physician." (Defs.' Mem. Supp. Mot. Summ. J. (Docket No. 53) Ex. A ("Amonette Aff.") ¶ 5.) The reports indicate that they were sent to the "Powhatan Receiving Unit." (Compl. Addenda A1, A2.) Amonette states that "[i]t appears that Plaintiff remained at the reception center until he was transferred to general population on July 9, 2001." (Amonette Aff. ¶ 7.) Amonette avers that the Powhatan Correctional Center "reception center" has its own doctor and medical staff. (Amonette Aff. ¶ 2.) In 2000, Amonette worked with the general population, not with the reception center. (Amonette Aff. ¶ 2.) One of the lab reports has the words "Chart Please" handwritten on it. (Compl. Addendum A1.) Dr. Amonette swears that he did not write "chart please" on the lab results. (Amonette Aff. ¶ 6.) Amonette did not have any involvement with Plaintiff until August 2002. (Amonette Aff. ¶ 8.)

### 3. Analysis of Claim Against Dr. Amonette

Plaintiff's allegation of Dr. Amonette's liability is based entirely on Plaintiff's speculation that it was Dr. Amonette who wrote "Chart Please" on Plaintiff's lab report. Dr. Amonette's affidavit belies this assertion. Plaintiff has submitted no competent evidence to suggest that Dr. Amonette wrote on Plaintiff's report or otherwise should have been aware of

Plaintiff's medical situation in March 2000. Plaintiff is required to cite affidavits, depositions, answers to interrogatories, or other materials in the record showing that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1)(a). Plaintiff's assumption that Dr. Amonette wrote "Chart Please" on Plaintiff's lab report, unsubstantiated by materials in the record and contrary to Dr. Amonette's affidavit, does not suffice to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(4) (requiring declarations used to support a motion for summary judgment to be made on personal knowledge). Accordingly, Claim 1(D) will be DISMISSED. Amonette's motion for summary judgment (Docket No. 52) will be GRANTED.

### 4. Allegations Against Defendant Hoffman

Plaintiff contends that Dr. Hoffman discontinued Plaintiff's special diet. Plaintiff's entire claim is based on an entry on one of Plaintiff's medical charts. Plaintiff suggests that on September 4, 2008, "Dr. Hoffm[a]n . . . wrote in [P]laintiff's medical chart that he reviewed [P]laintiff's chart and found no medical indication for 'greens with meals' diet." (Compl. 12.) Plaintiff admits that he "has never met with, spoken to, or even heard of Dr. Hoffm[a]n." (Compl. 12.) Because of this entry on Plaintiff's medical chart, Plaintiff is suing Dr. Hoffman for deliberate indifference to Plaintiff's medical needs. Plaintiff requests from Dr. Hoffman damages of $20,000, an amount which Plaintiff admits is "arbitrary." (Compl. 26–27.)

### 5. Summary Judgment Evidence Regarding Dr. Hoffman

A review of the medical chart reveals that an entry on September 4, 2008 appears to read, "I was given chart for review of dietary restrictions. Upon review, no indicator (medical) found for greens with meals." (Compl. Addendum CC (capitalization and punctuation corrected).) The entry is signed, but the signature is illegible. Dr. Hoffman swears that he did not make the entry

on Plaintiff's medical chart, nor does he know who did. (Defs.' Mem. Supp. Mot. Summ. J. (Docket No. 53) Ex. B ("Hoffman Aff.") ¶ 4.) He further declares that he never made an order to discontinue Plaintiff's diet. (Hoffman Aff. ¶ 4.)

### 6. Analysis of Claim Against Dr. Hoffman

Plaintiff's allegation of Dr. Hoffman's liability is based entirely on Plaintiff's speculation that it was Dr. Hoffman who made an entry regarding Plaintiff's diet on Plaintiff's medical chart. It is unclear why Plaintiff believes that Dr. Hoffman made this entry. Nevertheless, there is no competent evidence before the Court to suggest that it was Dr. Hoffman who made the entry. Plaintiff's assumption that Dr. Hoffman discontinued Plaintiff's special diet, unsubstantiated by materials in the record and contrary to Dr. Hoffman's affidavit, does not suffice to create a genuine issue of material fact. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (observing that a nonmoving party cannot "'create a genuine issue of material fact through mere speculation'" (*quoting Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985))). Accordingly, Claim 1(F) will be DISMISSED. Dr. Hoffman's motion for summary judgment (Docket No. 52) will be GRANTED.

### B. Claim 1(E): Defendant Harris

### 1. Allegations Against Dr. Harris

Plaintiff insists that Harris should have requested "some type of imaging study of [P]laintiff's liver," and should have requested that complete blood work be done. (Compl. 9.) Plaintiff also requested hepatitis A and hepatitis B vaccinations from Dr. Harris. (Compl. 9.) Dr. Harris denied the requests. (Compl. 9.) Plaintiff contends that the denial of this request violates the Eighth Amendment. (Compl. 9.)

10

Plaintiff admits that Dr. Harris submitted a request that a liver biopsy be performed (Compl. 8), Harris put Plaintiff on a daily multivitamin (Compl. 9), Harris requested that Plaintiff see a G.I. specialist (Compl. 8), and Harris required routine blood work every six months (Compl. 9). Dr. Harris told Plaintiff that Dr. Harris would not submit a request for treatment because the request would be denied due to Plaintiff's low platelet count. (Compl. 8.) Plaintiff understands that the biopsy and G.I. specialist requests were denied due to Plaintiff's low platelet count. (Compl. 8.) Nevertheless, Plaintiff states that Harris "refused to do anything at all concerning care and treatment." (Compl. 19.)

### 2.    Summary Judgment Evidence Regarding Dr. Harris

As an initial matter, the Court notes that many of the documents Plaintiff submitted in support of his allegations against Dr. Harris, including the medical articles, constitute hearsay. *See Cornelius v. Wilkinson*, No. 1:05-cv-00545, 2006 WL 2404136, at *5 (N.D. Ohio Aug. 18, 2006) ("Plaintiff submits several medical articles . . . . However these documents are not authenticated and constitute hearsay."). The Federal Rules of Evidence do provide a hearsay exception for learned treatises. Fed. R. Evid. 803(18). Such documents are only admissible, however, if they are "'called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination.'" *Cornelius*, 2006 WL 2404136, at *5 (*quoting* Fed. R. Evid. 803(18)); *see Wik v. Shelton*, No. CV 07-1726-HA, 2009 WL 2163529, at *1 (D. Or. July 17, 2009) (disregarding the submission of a medical publication meant to establish a medical standard of care because the document was not relied on by an expert witness). Because "Plaintiff fails to present these medical articles in conjunction with expert testimony," they "are inadmissible and may not support Plaintiff's allegations." *Cornelius*, 2006

WL 2404136, at *5; (*see* Resp. Mot. Summ. J. (Docket No. 63) 7 (calling the documents "valid and legitimate medical research").)

Furthermore, many of Plaintiff's conclusory statements in his response to the motion for summary judgment do not indicate that Plaintiff is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4); *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that a prisoner "wholly lacking in medical knowledge" may not give expert medical testimony). Moreover, Plaintiff's statement that he "developed esophagael [sic] varices" because of Defendants' "failure to . . . provide[] [him] treatment for hepatitis C" (Resp. Mot. Summ. J. (Docket No. 63) 2) is not supported by the materials to which Plaintiff cites, including medical consultation forms (Compl. Addenda VV, VV1). Accordingly, such statements are not considered evidence for purposes of opposing a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

Finally, Plaintiff's submissions regarding medical standards of care and proper medical procedures (Resp. Mot. Summ. J. (Docket No. 63) 3, 14–15) are not made on Plaintiff's personal knowledge, do not set forth facts which would be admissible in evidence, and do not show affirmatively that Plaintiff is competent to testify to those matters. *See Bell*, 2004 WL 3247156, at *4 (granting motion to strike inmate's statements regarding the accepted standards of medical care). Accordingly, such statements are not considered evidence for the purpose of opposing a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

The evidence before the Court indicates that the lab reports on which Plaintiff relies, created in 2000, were four years old when Harris began treating Plaintiff in 2004. (Def. Harris's Mem. Supp. Mot. Summ. J. (Docket No. 58) Attach. 1 ("Harris Aff.") ¶ 18.) When Plaintiff

arrived at DCC in 2004, Harris examined Plaintiff, noted that he was not on any medications, and that he was doing "okay." (Harris Aff. ¶ 3.) At that time, there were no signs or symptoms to indicate that further testing was warranted. (Harris Aff. ¶¶ 3, 18.)

In 2004 and 2005, Harris saw Plaintiff for eye and back problems, and for a follow-up after oral surgery. (Harris Aff. ¶¶ 4–6.) On January 30, 2006, Dr. Harris treated Plaintiff for cysts and tumors on Plaintiff's face and back. (Harris Aff. ¶ 7.) Harris ordered testing. (Harris Aff. ¶ 7.) Harris reviewed the results on February 8, 2006, and at that time noted that the results were abnormal, including elevated AST/ALT liver enzymes. (Harris Aff. ¶ 8.) When Harris became aware of Plaintiff's abnormal lab results, Harris initiated the steps medically indicated. (Harris Aff. ¶ 18.) Accordingly, Harris ordered a hepatitis panel. (Harris Aff. ¶ 8.)

On March 8, 2006, Harris reviewed the results of the hepatitis panel. (Harris Aff. ¶ 9.) The results indicated that Plaintiff had hepatitis C. (Harris Aff. ¶ 9.) Harris noted that Plaintiff was clinically stable. (Harris Aff. ¶ 9.) However, based on Plaintiff's test results, Harris felt Plaintiff was fast approaching liver biopsy stage. (Harris Aff. ¶ 9.) Harris prescribed a multivitamin and noted his plan to request a liver biopsy. (Harris Aff. ¶ 9.) The same day, Harris submitted a pre-registration request to the Medical College of Virginia ("MCV") along with Plaintiff's lab work. (Harris Aff. ¶ 10.) Harris also submitted a Utilization Management Referral Review Form to Dr. Stephens for approval for a G.I. consult at MCV and possible liver biopsy. (Harris Aff. ¶ 11.) Harris requested this to determine whether Plaintiff had any liver damage. (Harris Aff. ¶ 11.)

Dr. Stephens approved the G.I. consult. (Harris Aff. ¶ 12.) However, MCV reported back that a liver biopsy was not indicated due to Plaintiff's low platelet count. (Harris Aff. ¶ 12.)

If Plaintiff underwent surgery with a low platelet count, he could bleed out during the procedure. (Harris Aff. ¶ 12.) Dr. Stephens reviewed MCV's medical opinion and agreed that a liver biopsy was not indicated. (Harris Aff. ¶ 12.) Plaintiff's low platelet count also prevented the medical staff from beginning hepatitis C medicines. (Harris Aff. ¶ 13.) This is because the standard antiviral treatment for hepatitis C can further reduce the platelet numbers to dangerously low levels. (Harris Aff. ¶ 13.)

Harris ordered blood work in August 2006 and February 2007. (Harris Aff. ¶ 14–15.) The results continued to show a low platelet count. (Harris Aff. ¶ 14–15.) Harris examined Plaintiff in March 2007, noted that Plaintiff was not jaundiced, and noted that Plaintiff was clinically stable. (Harris Aff. ¶ 16.)

### 3.     Analysis of Claim Against Dr. Harris

In order to survive summary judgment, Plaintiff must demonstrate that Dr. Harris was deliberately indifferent to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999) (*citing Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). "Deliberate indifference requires a showing that the defendants . . . actually knew of and ignored [an inmate's] serious need for medical care." *Young v. City of Mount Ranier,* 238 F.3d 567, 575–76 (4th Cir. 2001) (*citing White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997)). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (*citing Rogers v.*

*Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). In this regard, the right to medical treatment is

limited to that treatment which is medically necessary and not to "that which may be considered

merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977).

Furthermore, absent exceptional circumstances, an inmate's disagreement with medical

personnel with respect to a course of treatment is insufficient to state a cognizable constitutional

claim, much less demonstrate deliberate indifference. *See Wright v. Collins,* 766 F.2d 841, 849

(4th Cir. 1985) (*citing Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3d Cir. 1970)). Thus, "[t]he Eighth

Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply

resolves 'the question whether additional diagnostic techniques or forms of treatment [are]

indicated.'" *Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir. 2006) (*quoting Estelle,* 429 U.S. at

107).

Plaintiff offers no competent evidence in support of his claim that Dr. Harris exhibited

deliberate indifference because Dr. Harris should have conducted "some type of imaging study of

[P]laintiff's liver." (Compl. 9.) Instead, Plaintiff merely attaches a website printout indicating

that a doctor can perform an ultrasound and conduct blood tests to help detect liver cancer.

(Compl. Addendum RR, at 7.) In support of Plaintiff's claim that Dr. Harris should have granted

Plaintiff's request to be vaccinated immediately for hepatitis A and hepatitis B, Plaintiff attaches

unauthenticated documents purporting to indicate that individuals "diagnosed with chronic

[hepatitis C] infection" should be offered the hepatitis A and B vaccination. (Compl. Addendum

PP, at 25–26; *see also* Compl. Addenda RR, at 6; UU, at 11; Resp. Mot. Summ. J. (Docket No. 63) 3.)[7]

Such unauthenticated documents submitted by Plaintiff do not constitute admissible evidence. Fed. R. Evid. 803(18), 901. Because Plaintiff failed to submit admissible evidence sufficient to overcome Dr. Harris's affidavit demonstrating the care provided to Plaintiff, and because a difference of opinion over the proper course of treatment does not constitute deliberate indifference, Claim 1(E) will be DISMISSED. *See McDonald v. Bayer*, 51 F. App'x 677, 678 (9th Cir. 2002) ("The district court also properly found that the [prison doctor's] failure to vaccinate [hepatitis C positive inmate] against Hepatitis A and B amounted only to a difference in medical opinion about the proper course of treatment." (*citing Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir 1996))); *Zimmerman v. Prison Health Servs., Inc.*, 36 F. App'x 202, 203–04 (7th Cir. 2002) (concluding that doctor did not disregard an excessive risk to hepatitis C positive inmate's health when he refused to innoculate inmate against hepatitis A based on the lack of a hepatitis A infection in the prison system). Dr. Harris's motion for summary judgment (Docket No. 57) will be GRANTED.

## C.    Claim 1(G):  Defendant Manickavasagar

In 2007, Dr. Manickavasagar and others replaced Dr. Harris. (Compl. 9.) Plaintiff admits that once Dr. Manickavasagar replaced Dr. Harris, "appropriate and necessary procedures were begun." (Compl. 24.) Nevertheless, Plaintiff raises several claims against Dr. Manickavasagar. Specifically, Plaintiff claims that Manickavasagar (1) did not adequately

---

[7] Dr. Harris swears that he is unaware of any requirement or protocol requiring all hepatitis C patients to receive hepatitis A and B vaccines. (Harris Aff. ¶ 19.)

explain the results of Plaintiff's CT scan, (2) waited until Plaintiff filed a grievance form before changing Plaintiff's multivitamin prescription, (3) delayed the provision of medical care regarding treatment of a soft tissue swelling in Plaintiff's abdominal wall, and (4) misinformed Plaintiff about which vaccinations Plaintiff was receiving.

Many of Plaintiff's conclusory statements in his response to the motion for summary judgment do not indicate that Plaintiff is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4); *Pearson*, 237 F.3d at 886. For example, Plaintiff's statement that he developed cirrhosis of the liver and other ailments because of defendants' "failure and refusal to . . . provide [him] treatment for hepatitis C" (Resp. Mot. Summ. J. (Docket No. 71) 2–3) is not supported by the materials to which Plaintiff cites, including medical charts (Compl. Addendum DD), medical consultation forms (Compl. Addenda VV, VV1), and lab reports (Compl. Addendum XX). Accordingly, such statements are not considered evidence for purposes of opposing a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

### 1.    Claim 1(G)(1):  Allegations Regarding the CT Scans

Plaintiff received two CT scans, one in April 2008, and one in July 2008. The April and July scans were different, and Plaintiff received various explanations for the differences, although none of the explanations make sense to him. (Compl. 11.) Plaintiff "addressed the issue in [a] grievance log . . . and informal complaint." (Compl. 12.) In his complaint, Plaintiff states that "[i]t has been over four (4) months since then and [P]laintiff has been notified of nothing." (Compl. 12.) Based on this, Plaintiff complains that "Defendants Manickavasag[a]r, Badgett[] and Stephens are content completely ignoring this matter and by so doing are demonstrating a deliberate indifference to plaintiff's medical needs." (Compl. 12.)

## 2. Summary Judgment Evidence Regarding the CT Scans

On September 17, 2007, Manickavasagar first examined Plaintiff for care of Plaintiff's hepatitis C. (Def. Manickavasagar's Mem. Supp. Mot. Summ. J. (Docket No. 66) Attach. 1 ("Manickavasagar Aff.") ¶ 2.) At that time, Plaintiff had no complaints, and Manickavasagar's examination was normal. (Manickavasagar Aff. ¶ 2.) Manickavasagar ordered lab work and reviewed the results. (Manickavasagar Aff. ¶¶ 2–3.) Over the course of the next several months, Dr. Manickavasagar and Dr. Ajumobi ordered additional testing and reviewed the lab results.

In March 2008, Dr. Manickavasagar discussed with Plaintiff the difficulties of treating Plaintiff's condition in light of Plaintiff's low platelet count. (Manickavasagar Aff. ¶ 11.) Manickavasagar considered whether Plaintiff's low platelet count could be due to an enlarged spleen. (Manickavasagar Aff. ¶ 11.) To make this determination, Manickavasagar believed a CT scan of Plaintiff's abdomen would be useful. (Manickavasagar Aff. ¶ 11.) Accordingly, Plaintiff received a CT scan at Southampton Memorial Hospital in April 2008. (Manickavasagar Aff. ¶ 13.) The CT scan revealed a mass on Plaintiff's lung.[8] (Manickavasagar Aff. ¶ 13.) Manickavasagar and others ordered further testing. (Manickavasagar Aff. ¶¶ 14–16.)

In July 2008, Plaintiff was seen by a pulmonologist at MCV. (Manickavasagar Aff. ¶ 18.) The pulmonologist recommended and conducted a chest CT scan. (Manickavasagar Aff. ¶ 18.) The medical charts reveal that on September 12, 2008, Dr. Ajumobi discussed the results of the CT scan with Plaintiff. (Manickavasagar Aff. ¶ 22, Ex. 1 ("Progress Notes"), at 19.)

---

[8] Claims 2(D) and 2(E) regarding Plaintiff's lung condition are discussed *infra* in Part III.F.

### 3. Analysis Regarding CT Scans

Plaintiff's complaint about not receiving adequate explanations about the differences in his CT scans does not indicate deliberate indifference. *See Harrelson v. Canterberry*, No. 5:10-0216, 2010 WL 5480744, at *1, *7 (S.D. W. Va. Dec. 13, 2010) (granting a motion to dismiss a complaint alleging, *inter alia*, that prison medical staff provided no explanation regarding the plaintiff's X-ray); *Glover v. Grady*, No. 03-0064 (WHW), 2008 WL 3843513, at *3–5 (D.N.J. Aug. 15, 2008) (granting defendants' motion for summary judgment for, *inter alia*, a claim that prison medical staff changed a prescription without adequate explanation) (*citing Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000)). The evidence before the Court regarding the CT scans does not indicate that Plaintiff has suffered an unnecessary and wanton infliction of pain due to Defendants' inadequate explanations. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Accordingly, Claim 1(G)(1) will be DISMISSED.[9]

### 4. Claim 1(G)(2): Allegations and Evidence Regarding the Multivitamin

"Plaintiff discovered that the multivitamin he had been taking for several years lacked some key vitamin and mineral supplements . . . ." (Compl. 14.) Plaintiff complained, and Dr. Manickavasagar told Plaintiff that "it is against D.O.C. policy to provide a mineral supplement and/or more complete and appropriate multivitamin/mineral supplement." (Compl. 14.) Plaintiff filed an informal complaint "in order to be provided with a more complete and appr[o]priate multivitamin." (Compl. 14.) Plaintiff was prescribed a different multivitamin. (Manickavasagar Aff. ¶¶ 21, 26, 41.) Plaintiff argues that this is "another example of the defendants[']

---

[9] Plaintiff also raises this claim against Defendant Badgett. The Court dismisses this claim against her *infra*.

indifference to [P]laintiff's medical needs." (Compl. 14–15.) Plaintiff complains that "on most issues and matters the [P]laintiff must discover information on his own and then file grievances and informal complaints in order to receive even routine and standard testing and/or treatment." (Compl. 19.)

### 5.    Analysis Regarding Multivitamin

The Court construes Plaintiff's complaint that he had to file a grievance before the prison medical staff would change his multivitamin as an allegation of delayed medical care. To survive summary judgment for such a claim, Plaintiff must introduce admissible evidence indicating that the delay in the provision of medical care "'resulted in substantial harm.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (*quoting Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (*quoting Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (identifying this substantial harm requirement as an addition to the objective prong analysis); *see Webb v. Hamidullah*, 281 F. App'x 159, 166–67 n.13 (4th Cir. 2008) (explaining that where an Eighth Amendment claim is predicated on a delay in the provision of medical care, the plaintiff must demonstrate "'that the delay resulted in substantial harm'" (*quoting Sealock*, 218 F.3d at 1210)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citing cases).

Even if Plaintiff experienced a delay in waiting for approval in the change of his multivitamin, he fails to direct the Court to evidence that such delay resulted in any harm, much less substantial harm to his person. Accordingly, Claim 1(G)(2) will be DISMISSED.

### 6. Claim 1(G)(3): Allegations Regarding the Soft Tissue Swelling in Abdominal Wall

Plaintiff makes the following complaint regarding the soft tissue swelling in his abdominal wall:

> Plaintiff is still trying to have the soft tissue tumor removed from his abdominal wall in order to have a biopsy done on it. This is an issue that has been ongoing for years with no results. In response to grievance . . . [P]laintiff has been told "more information is needed before approval." Why doesn't Dr. Manickavasag[a]r and the medical staff and personnel of [DCC] send all needed information with the request? This is another example of defendants' delaying treatment, diagnosis and evaluation of a medical need and condition. This demonstrates a knowing and deliberate indifference to plaintiffs' medical care, needs and treatment by defendants Johnson, Davis, Stephens, Badgett[,] Manickavasag[a]r[,] and Schil[l]ing[].

(Compl. 22.) In his response to the motion for summary judgment, Plaintiff alleges, "The soft tissue swelling on the [P]laintiff's abdominal wall has not been removed." (Resp. Mot. Summ. J. (Docket No. 71) 6.)

### 7. Summary Judgment Evidence Regarding the Soft Tissue Swelling in Abdominal Wall

Dr. Manickavasagar "saw Plaintiff on May 18, 2009, for swelling in the right abdominal area." (Manickavasagar Aff. ¶ 44.) "On May 28, 2009, [Dr. Manickavasagar] submitted a QMC consult request for a general surgery consult for a biopsy of the soft tissue swelling in the abdominal wall." (Manickavasagar Aff. ¶ 44.) After that, Manickavasagar was no longer involved in Plaintiff's medical care. Manickavasagar states, "It appears that the soft tissue swelling was removed." (Manickavasagar Aff. ¶ 45.)

### 8. Analysis Regarding the Soft Tissue Swelling in Abdominal Wall

To the extent that Plaintiff alleges a delay in care for the swelling in his abdominal wall,
Plaintiff has not directed the Court to evidence in the record indicating that such delay in the
provision of medical care "'resulted in substantial harm.'" *Mata*, 427 F.3d at 751 (*quoting
Oxendine*, 241 F.3d at 1276). Nor has Plaintiff directed the Court to evidence in the record
indicating that he suffers a serious risk of substantial harm in the future. *Helling v. McKinney*,
509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to inmates is
not a novel proposition."). Absent such past or future harm, Plaintiff may not recover damages
for any delay in medical care.[10] Accordingly, Claim 1(G)(3) will be DISMISSED.[11]

### 9. Claim 1(G)(4): Allegations and Analysis Regarding the Hepatitis A and B Vaccinations

The doctors that replaced Dr. Harris, of which Manickavasagar was one, provided
Plaintiff with a hepatitis B vaccination in 2007. (Compl. 9–10.) Plaintiff, however, alleges that
he "was led to believe" that it was a vaccination for both hepatitis A and B. (Compl. 9.) On
January 26, 2009, Plaintiff requested the hepatitis A vaccine, and received it four days later.
(Compl. 9.) Plaintiff contends that these allegations indicate the doctors' unreliability. (Compl.
9–10.) No competent evidence is before the Court indicating that any harm resulted from either

---

[10] The parties dispute whether the soft tissue swelling was removed from Plaintiff's
abdominal wall. Plaintiff merely states, without providing competent evidence in support, that
the area has not been removed. Manickavasagar swears that "it appears" that the area has been
removed. Manickavasagar's basis for this statement is unclear. Nevertheless, because there is a
"complete failure of proof" regarding any harm suffered by the delay, all other facts are rendered
immaterial. *Celotex*, 477 U.S. at 322–23. Accordingly, there is no genuine issue of material fact
for trial.

[11] Plaintiff also raises this claim against Defendants Badgett and Johnson. The Court
dismisses this claim against them *infra*.

22

the delay in receiving the hepatitis A vaccine or Plaintiff's original misunderstanding regarding the vaccine he received in 2007. *Mata*, 427 F.3d at 751. Absent such harm, Plaintiff may not recover damages for any delay in the provision of the vaccine. Accordingly, Claim 1(G)(4) will be DISMISSED. The entirety of Claim 1(G) will be DISMISSED. Defendant Manickavasagar's motion for summary judgment (Docket No. 65) will be GRANTED.

### D.     Claim 1(H): Defendant Badgett

Plaintiff incorporates Defendant Badgett in many of his allegations against other defendants. For the reasons stated previously regarding these claims, the claims are DISMISSED regarding Defendant Badgett.[12]

#### 1.     Allegations Against Defendant Badgett

Plaintiff's most detailed complaint about Badgett is as follows:

> As Head Medical Administrator, defendant Badgett[] is responsible for and oversees all the activities, testing, duties and care . . . concerning all inmates at [DCC], including the [P]laintiff. Defendant Badgett[] is well aware of [P]laintiff's medical needs and requirements as stated in response to all grievances filed by the [P]laintiff; "The Facility Unit Head, in conjunction with the Health Authority, will ensure that offenders have access to, and are provided adequate health care services, etc. . ." From reviewing the facts . . . it is obvious that Badgett[] has not fulfilled her duties and responsibilities in providing anything near adequate care and/or treatment. Defendant Badgett[] has demonstrated a knowing and deliberate indifference to [P]laintiff['']s health, medical care and/or treatment and placed him in imm[i]nent danger of further harm and damage.

(Compl. 18.)

---

[12] For example, Plaintiff claims Badgett is liable because she did not adequately explain the differences between Plaintiff's CT scans and did not act swiftly enough on reviewing them (Compl. 11-12), which the Court rejects as to Manickavasagar, *see supra* note 9 and accompanying text. Plaintiff also incorporates Badgett into his claim regarding the soft tissue swelling (Compl. 22), which the Court rejects as to Manickavasagar, *see supra* note 11 and accompanying text.

### 2. Summary Judgment Evidence Regarding Defendant Badgett

It appears that Plaintiff seeks relief from Badgett because Badgett had a supervisory role in the medical unit at DCC. In the documents he attached to his complaint, for example, Badgett is only mentioned as a carbon-copy recipient of an inmate grievance response form. (Compl. Addendum M.)

Badgett's limited involvement with Plaintiff's treatment is confirmed by Badgett's affidavit. (*See* Defs. Mem. Supp. Mot. Summ. J. (Docket No. 53) Ex. C ("Badgett Aff.").) Badgett is the head nurse in charge of the medical department at DCC. (Badgett Aff. ¶ 1.) For the most part, Badgett was not involved in Plaintiff's care. In June 2007, Badgett noted that Plaintiff was not entitled to a refund of his co-pay for glasses. (Badgett Aff. ¶ 4.) In September 2008, Badgett followed up on an physician's statement that Plaintiff was not medically indicated for a special diet. (Badgett Aff. ¶ 4.) This is the extent of Badgett's involvement with Plaintiff's care.

### 3. Analysis of Claims Against Defendant Badgett

It is clear that Plaintiff is attempting to state a claim against Badgett merely based on her supervisory role. (*See* Resp. Mot. Summ. J. (Docket No. 64), at 33 ("Defendant Badgett has deliberately and knowingly violated his Eighth Amendment Rights by demonstrating supervisory indifference (liability) . . . .").) The theory of *respondeat superior*, however, is not available for § 1983 actions. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Rather, Plaintiff must demonstrate that the supervisory defendants personally were deliberately indifferent to a serious medical need. This standard requires a plaintiff to introduce evidence from which the finder of fact could conclude that "the official in question subjectively recognized a substantial risk of

harm" and "that the official in question subjectively recognized that [her] actions were 'inappropriate in light of that risk.'" *Parrish ex re. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (*quoting Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). Plaintiff has not done so. Nor has Plaintiff introduced evidence indicating that he was denied medical care as a result of "another's conduct in execution of [Badgett's] policies or customs." *Kendrick v. Russell*, No. 7:11-cv-00099, 2011 WL 902203, at *2 (W.D. Va. Mar. 14, 2011) (*citing Fisher v. Wash. Metro. Area Transit Auth.*, 690 F.2d 1133, 1142–43 (4th Cir. 1982), *abrogated on other grounds by Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991)). Furthermore, Badgett is entitled to rely on the doctors' judgment regarding the appropriate course of Plaintiff's treatment. *Wilson v. Collins*, No. 7:08CV00638, 2010 WL 785377, at *16 (W.D. Va. Mar. 5, 2010) (*citing Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)). Claim 1(H) will be DISMISSED. Badgett's motion for summary judgment (Docket No. 52) will be GRANTED.

### E.     Claim 1(I):  Defendant Johnson

As an initial matter, Plaintiff includes Nurse Johnson in allegations against other defendants. To the extent those allegations fail with regard to those defendants, they also fail with regard to Defendant Johnson.[13]

#### 1.     Allegations against Defendant Johnson

Plaintiff makes the following claim against Johnson:

On March 12, 2009 plaintiff spoke with medical personel [sic] at Deerfield Correctional Center (Nurse Johnson and Ms. Faison) concerning the liver ultrasound

---

[13] For example, Plaintiff names Johnson as a defendant in his claim concerning the soft tissue swelling (Compl. 22) which the Court rejects as to Manickavasagar, *see supra* note 11 and accompanying text, and in Plaintiff's claim concerning treatment for his lung mass (Compl. 21-22), which the Court rejects as to Manickavasagar and Badgett, *see infra* Part III.F.

that was (is) supposed to be done. As of that date, this procedure still had not been scheduled despite [P]laintiff being told on January 12, 2009 in response to Informal Complaint Tracking # 55 that this had been approved . . . . This procedure has been requested and recommended by two (2) separate G.l. specialist [sic] and needs to be done before a follow-up visit. This is one more example of the defedents [sic] delaying standard and routine medical testing even after it has been requested by the specialists that the [P]laintiff was sent to be evaluated by. This is the same pattern of delaying and/or denying treatment (testing) that has been demonstrated by all of the defedents [sic] over and over again throughout the years.

(Compl. 20.) Plaintiff also makes the following additional claim against Defendant Johnson:

Defendant Johnson has demonstrated a continued and predictable pattern of denials and delays in arranging medical care, treatment, evaluations, testing and diagnosis. Johnson has been well aware of [P]laintiff['s] medical problems and issues and her actions and lack of actions have caused the [P]laintiff irreversible and irreparable harm and damage to vital organs (liver, spleen, esophagus, gallbladder, etc. . . ) and placed him at imminent danger and risk of further harm, damage, pain and suffering.

(Compl. 22 (ellipsis in original).) Plaintiff lists the numerous grievance forms to which Nurse

Johnson responded, and then states that "[t]he actions and lack therof [sic] by Johnson have

directly contributed to and led to the developement [sic] of esophagul [sic] varices, deterioration

of white blood cells and platelet count, cirrhosis of the liver from hepatitis C and organ damage."

(Compl. 23.)

### 2.     Summary Judgment Evidence Regarding Defendant Johnson

The evidence in the record to which Plaintiff cites (*see* Compl. 22–23) consists of fifteen

documents. The documents to which Plaintiff cites include many levels of grievance forms

signed by various individuals. The Court presumes that Plaintiff intends to cite to those forms to

which Defendant Johnson responded and appears to have signed. Each are described in

chronological order:

1.     The first document includes an informal complaint form filed May 7, 2008. On this form, Plaintiff explains that he normally receives bloodwork every six

months, in February and August. Plaintiff explains that he spoke to a doctor in February or March, and the doctor wanted to wait until the CT scan was completed. Plaintiff avers that the CT scan was completed on April 17, 2008, and the bloodwork is past due. A member of the medical staff responded, "A request has been sent to Richmond for a consult with a liver specialist. Once approval is received an appointment will be made. No blood work is indicated at this time. The MD is awaiting recommendations from specialist." The document is not signed by Nurse Johnson. (Compl. Addendum GG.)

2.     The second document includes an informal complaint form filed July 30, 2008. On this form, Plaintiff complains that he did not receive greens with his meal. Nurse Johnson responded, "Per Dr. Stephens there are special diets other than diabetic diets. This has come from the Office of Health Services, which we must comply." (Compl. Addendum BB.)

3.     The third document includes an informal complaint form filed September 1, 2008. On this form, Plaintiff complains that he has not been provided an adequate explanation regarding the differences between his two CT scans. Nurse Johnson responded, "The medical department is aware of C.T. scan results. The plan is to have these films reviewed again. You will be notified when this has occurred."[14] (Compl. Addendum AA; *see generally supra* Part III.C.1.)

4.     The fourth document includes an informal complaint form filed September 1, 2008. On this form, Plaintiff requested to be seen by a hepatologist instead of a gastroenterologist. Nurse Johnson responded, "You were evaluated at the A.D. Williams clinic 8/13/08. The medical doctor at DRCC followed and ordered their recommendations. You will be worked up and reevaluated accordingly." (Compl. Addendum HH.)

5.     The fifth document includes an informal complaint form filed on September 15, 2008. On this form, Plaintiff requests a different multivitamin. Nurse Johnson responded, "The medical doctor on 9/9/08 saw you on MD call clinic. He at that time ordered you multiple vitamins one once a day for 30 days with 5 refills." (Compl. Addendum NN.)

6.     The sixth document includes an informal complaint form filed October 26, 2008. On this form, Plaintiff complains that he has not been receiving fresh vegetables and fruit with his meals. Nurse Johnson responded, "We are in the process of getting this established for you. You will be notified by medical when this is completed. It will ultimately be the decision of Health Services." (Compl. Addendum DD2.)

---

[14] Capitalization is corrected in quotations to Nurse Johnson's responses.

7.   The seventh document includes an informal complaint form filed on January 7, 2009. On this form, Plaintiff requests more thorough explanations of his bloodwork. Nurse Johnson responded, "You will be seeing a G.I. specialist very soon. Your lab work will be explained for you once they [sic] results have been completed." (Compl. Addendum MM1.)

8.   The eighth document includes an informal complaint form filed on January 7, 2009. On that form, Plaintiff complains that although a G.I. specialist requested that Plaintiff receive an ultrasound of his liver, he had not yet received one. Nurse Johnson responded, "We have received the requested approval. You will be notified by security when to report to medical." (Compl. Addendum NN2.)

9.   The ninth document includes an inmate request form filed April 13, 2009. On that form, Plaintiff explains that he has received all of the testing recommended by the G.I. specialist and Plaintiff requests a follow-up visit with a doctor to discuss treatment for hepatitis C. Nurse Johnson responded, "You will be scheduled to see the M.D." (Compl. Addendum YY.)

10.  The tenth document includes an inmate request form filed on April 13, 2009. On that form, Plaintiff requests a visit with the doctor to confirm that he will be scheduled for a follow-up visit regarding the mass on Plaintiff's lung. Nurse Johnson responded that Plaintiff had been scheduled for M.D. call. (Compl. Addendum AAA.)

11.  The eleventh document includes an inmate request form filed on April 13, 2009. On that form, Plaintiff requests a visit with the doctor regarding the tumor on his abdominal wall. Nurse Johnson informed Plaintiff that he was scheduled for MD call. (Compl. BBB.)

12.  The twelfth document includes an informal complaint form filed on May 10, 2009. On that form, Plaintiff complains about difficulties he had been experiencing regarding a follow-up appointment with medical staff. Nurse Johnson responded, "Your appointment has been scheduled with the G.I. doctor. You will be notified accordingly." (Compl. Addendum YY.)

13.  The thirteenth document includes an informal complaint form filed on May 10, 2009. On that form, Plaintiff complains about difficulties he had been experiencing regarding a follow-up appointment with medical staff. Defendant Johnson responded to the complaint, "You were evaluated this week for the above complaint. Lab work, X-ray, EKG was requested for you. Per our conversation 5/12/09 you indicated that a Hep C viral load was also indicated. As I told you this will be looked into by week's end. You will be notified accordingly." (Compl. Addendum AAA.)

14.     The fourteenth document includes an informal complaint form received by medical staff on May 11, 2009. On that form, Plaintiff complains about difficulties he had been experiencing regarding a follow-up appointment with medical staff. Defendant Johnson responded to the complaint, "Mr. Hogge you will [be] seen for this issue very shortly. In view of your other health concerns we are working very hard to have those issues addressed. You will be scheduled very shortly for this matter. We may need to seek approval for any possible surgery or biopsy of this area however it will be addressed." (Compl. Addendum BBB.)

15.     The fifteenth document includes an informal complaint form filed on May 17, 2009. On that form, Plaintiff complains that he had not received necessary bloodwork. Defendant Johnson responded to the complaint, "The tests you are referring to were the recommendations that were sent back after your off site appointment - It is at the discretion of the facility's medical [doctor] to order the necessary tests, based upon your health issues." Johnson further stated, "Several of these tests have previously been done and there was [no] need for duplicating them." (Compl. Addendum CCC.)

### 3.     Analysis of Claims Against Defendant Johnson

In the record before the Court, it appears that Plaintiff asserts liability over Nurse Johnson based on her position as the individual responsible for responding to his informal medical complaints. It is clear that Plaintiff seeks damages from Nurse Johnson because although she "has been well aware of [P]laintiff['s] medical problems," Plaintiff is dissatisfied with her responses to his grievances. (Compl. 22.) Plaintiff merely asserts that she is responsible for a delay in his receiving a liver ultrasound, and otherwise contends that her "denials and delays in arranging medical care, treatment, evaluations, testing and diagnosis" resulted in "irreversible and irreparable harm and damage to vital organs (liver, spleen, esophagus, gallbladder, etc. . . ) and placed [Plaintiff] at imminent danger and risk of further harm, damage, pain and suffering." (Compl. 20, 22 (ellipsis in original).)

Plaintiff has not provided any evidence suggesting that Nurse Johnson was deliberately indifferent to his medical needs.[15] To the contrary, "[i]n view of this overall treatment record," any "isolated delays [Plaintiff] encountered simply cannot support a finding of deliberate indifference." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). Although he alleges that Nurse Johnson caused him permanent harm, Plaintiff has produced no competent evidence to support this assertion. *Pearson*, 237 F.3d at 886. Absent a showing of such harm, Nurse Johnson cannot be liable for any alleged delay in treatment. *Webb*, 281 F. App'x at 166–67 n.13. Furthermore, Nurse Johnson is entitled to rely on the doctors' judgment regarding the appropriate course of Plaintiff's treatment. *Wilson*, 2010 WL 785377, at *16 (*citing Miltier*, 896 F.2d at 854). Accordingly, Claim 1(I) will be DISMISSED. Defendant Johnson's motion for summary judgment (Docket No. 52) will be GRANTED.

### F.     Claims 2(D) And 2(E):  Plaintiff's Lung Mass

Plaintiff complains about the quality and quantity of treatment he received for a mass on his lung.  Claim 2(D) alleges liability against Manickavasagar and Claim 2(E) alleges liability against Badgett.

---

[15] It is possible that an individual tasked with responding to prisoners' complaints could be found deliberately indifferent.  For example, if she "routinely sent each grievance to the shredder without reading it, that might be a ground of liability." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (*citing Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005); *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)).  Or perhaps she could be liable if she "intervened to prevent the medical unit from delivering needed care." *Id.* (*citing Hernandez v. Keane*, 341 F.3d 137 (2d Cir. 2003); *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004)).  Plaintiff has not produced any evidence of such conduct by Nurse Johnson.  Rather, the record reflects that Nurse Johnson consistently processed Plaintiff's grievances, appropriately referring him to doctors or providing him further information.

### 1. Summary of Allegations

The CT scan performed on April 17, 2008 revealed a small mass on Plaintiff's lung. (Compl. 11.) On July 30, 2008, Plaintiff received a CT scan of his chest. (Compl. 11.) At the time Plaintiff filed his complaint, Plaintiff stated that he had "no idea what, if any, further testing is being done concerning this mass on his lung and no-one is willing or able to explain this to him." (Compl. 11.) Nevertheless, Plaintiff states that on July 9, 2009, Plaintiff was transported to MCV for a follow-up consultation with a pulmonologist concerning the mass on his lung. (Compl. 21.) The mass was a calcified granuloma, requiring no further treatment. (Manickavasagar Aff. ¶ 45.) The pulmonologist informed Plaintiff that his lung condition was stable and nothing else needed to be done. (Compl. 21.)

Despite this result, Plaintiff complains that "Dr. Manickavasag[a]r refuses to persue [sic] the matter concerning the mass on [P]laintiff's lung and the follow-up visit requested by the pulmonologist." (Compl. 19.) Plaintiff avers that "tremendous stress, worry and concern" resulted from the delay in conducting a follow-up consultation. (Compl. 21.)

### 2. Analysis

Plaintiff does not provide evidence that any substantial harm resulted from the treatment or delay in treatment of his lung. *Webb*, 281 F. App'x at 166–67 n.13. As the Court noted in its September 24, 2010 Memorandum Opinion, "The ultimately benign nature of the nodule in his lung belies any claim by Plaintiff that his condition was objectively 'sufficiently serious' to require medical treatment." *Hogge v. Stephens*, No. 3:09CV582, 2010 WL 3834856, at *6 (E.D. Va. Sept. 24, 2010) (*quoting Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995)). Accordingly, Claims 2(D) and 2(E) will be DISMISSED.

## G.    First Amendment Claims

Plaintiff alleges that some Defendants violated his First Amendment "right of access to the courts." (Compl. 23–24.)  This allegation is based on Plaintiff's belief that medical information was withheld from Plaintiff, which slowed his filing of grievances.  Plaintiff's own filings demonstrate his ability to file grievances and file suit in this Court.  There is no competent evidence before the Court to permit the Court to conclude that Plaintiff's ability "to petition the Government for a redress of grievances" has been hindered.  U.S. Const. amend. I.  Furthermore, in order to plead a backward-looking denial of access to the courts claim, a plaintiff must identify with specificity a non-frivolous legal claim that he was prevented from litigating by the defendants' actions.  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Lewis v. Casey*, 518 U.S. 343, 351–53 & n.3 (1996).  Plaintiff has not done so.  Accordingly, Plaintiff's First Amendment claim against Defendants is DISMISSED.  *See* 28 U.S.C. § 1915A(b)(1).

Plaintiff also contends that prison staff is limiting his access to the law library.  (*See* Docket No. 42.)  Because the individuals who are alleged to be responsible are not parties to this action, and because no "right to relief is asserted against [those individuals and the defendants in this case] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," the Court will not consider these claims.  Fed. R. Civ. P. 20(a)(2)(A).  Plaintiff is free to raise these issues in a separate action.

## H.    Injunctive Relief

Plaintiff requests injunctive relief.  (Compl. 25.)  In order to survive summary judgment, Plaintiff was required to "come forward with evidence from which it can be inferred that the defendant-officials . . . are at the time of summary judgment, knowingly and unreasonably

disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 938 (4th Cir. 1995) (*citing Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)) (requiring Plaintiff to show that irreparable injury will result unless an injunction issues). Plaintiff has not demonstrated Defendants are disregarding an objectively intolerable risk of harm. Rather, the evidence reflects that Plaintiff's liver enzymes are regularly monitored to assess the progress, if any, of his disease. Plaintiff fails to demonstrate that he currently faces an "objectively intolerable risk of harm" from the lack of additional medical intervention at this time with respect to Plaintiff's hepatitis C or other ailments. *Farmer*, 511 U.S. at 846.

An appropriate Order will accompany this Memorandum Opinion.

Date: 6-1-11
Richmond, Virginia

/s/
James R. Spencer
Chief United States District Judge